

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 21, 2016

**VIA ECF**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York  10007

    Re: *United States* v. *Hassan Khan*, 15 Cr. 804 (JSR)

Dear Judge Rakoff:

    The defendant in the above-captioned case, Hassan Khan, is scheduled to be sentenced on June 24, 2016, for his offense in this case; namely, enticing a minor victim to engage in illegal sexual contact and enticing that minor to produce child pornography.  The Government respectfully submits this letter in advance of the sentencing and in response to the defendant's pre-sentence submission, dated June 14, 2016 ("Def. Mem."), and the defendant's letter to the Court, submitted June 20, 2016 ("Defendant Letter" or "Def. Ltr.").

    Under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."), and as set forth in the plea agreement, dated January 4, 2016, the sentencing range applicable to the defendant's conduct is 292 to 365 months' imprisonment (the "Guidelines Range").  The Government does not oppose the imposition of a sentence below the Guidelines Range, but strongly believes, for the reasons set forth below, that a sentence substantially higher than the 10-year mandatory minimum is necessary and appropriate to reflect the seriousness of the offense conduct.

## Background

### A.   The Offense Conduct

    The defendant's conduct in this case was disturbing, calculated, and extraordinarily damaging to the minor victim (the "Victim").  In sum, the defendant met the Victim online when she was just 11 years old, groomed her for years, engaged in increasingly sexualized chats via text and then video, including convincing the Victim to transmit live nude images of herself to him, and, finally, after years of manipulative and controlling behavior, traveled to a foreign country to have sex with the then-15-year-old Victim.  (*See* Probation Office's Pre-Sentence Investigation Report ("PSR") ¶¶ 12-25.)

Hon. Jed S. Rakoff
June 21, 2016
Page 2

In approximately October 2007, the defendant met the Victim online, in a virtual reality game for children called Habbo Hotel, which allows for chat room functionality and interaction through cartoon character "avatars." At the time, the Victim was 11 years old and the defendant was 20 years old and in college. Following their initial communications, the defendant and the Victim exchanged additional contact information and continued to chat on MSN Messenger, an online chat platform. The earliest records remaining from their communications are from March 2009. No later than that time period, when the Victim was 12 years old, the defendant was already overtly sexualizing the Victim, making comments and asking questions about her appearance and attire, and attempting to persuade the Victim to show herself to him in sexually suggestive ways. (*See* PSR ¶¶ 12-15.)

In March 2009, he wrote, for example, "i wonder if you are still in your dance clothes," and when the Victim responded that she had changed into different pants, he asked, "oh nice, can i seem them lol." On the same day, he later wrote, "oh and I still want to see you dressed up in costume, and i'll keep annoying you about it lol. . . . **well hopefully i will annoy you so much, you'll just crash and show it lol**. . . . i am sure you will eventually feel pity for me and then show it."[1] In April 2009, during a webcam video chat, he wrote to the Victim that she looked "shockingly hot." In the same month, when the Victim referred to a photo of herself in a dance uniform, the defendant stated, in a series of messages, "i bet its like a super hot pic . . . i want to see it now . . . um any chance i may see it." In September 2009, the defendant asked the Victim "whats the age of consent" in her country of residence, and suggested that "its probably 16 there." Later that day, the defendant asked, "so how old do you want to be when you first do it, or is that too weird of a question haha," *see id.* ¶ 14, and discussed with the Victim whether she would ever perform oral sex, which he referred to colloquially.

At the time of these 2009 chats, the Victim was just 12 years old. The defendant, who then was 21 years old, believed she was 13; when they met—when the Victim was 11—she told the defendant she was 12, to seem more grown-up. When she turned 13, the Victim revealed her true age to the defendant, who was then 22 years old.[2] Shortly thereafter, in December 2009, in response to the Victim commenting that her hands were cold, the defendant wrote, "lol you need to masterbate, then you'll be able to feel them." The defendant subsequently asked to see the Victim's stomach; when she said no, he replied, "i don't know why i cant let this go. . . . you could just show it and get it over with[,] well both be happy that way lol."

The following year, in September 2010, when the Victim was still 13, the defendant wrote to her, "**yah you suck lollipops and you are practicing for bjs**." (*See id.* ¶ 19.) In the following months, the defendant repeatedly asked the Victim to show more of herself on camera and asked her about her interest in various sexual acts. Throughout 2010, the video chats between the defendant and the Victim became increasingly sexually explicit, including individual and mutual depictions of nudity and/or masturbation. (See *id.* ¶ 18.)

---

[1] Emphases added throughout unless otherwise specified.

[2] The defendant himself referred to this revelation in chats to the Victim; e.g., in October 2011, he wrote, "oh you know the thing i remembered from 2 years ago [. . .] i was like hey [Victim], happy 14th birthday and then you were like oh its actually my 13th birthday." (*See* PSR ¶ 16.)

Hon. Jed S. Rakoff
June 21, 2016
Page 3

As the communications continued, the defendant became increasingly controlling, a development he openly acknowledged. In a July 2011 chat, when the Victim was 14, the defendant wrote, "so is it weird that i am like super possessive about you." In that same conversation, the defendant asked the Victim at what age she thought she would be ready for engagement or marriage, before turning back to sexual requests: "can i see like idk [I don't know] something, sorry i am slightly in perv mode. . . . lol we need to have another perv date btw. . . . **i am going to have crazy sex with you**." (*See id.* ¶ 39.) A few days later, the defendant sent the Victim an email that stated, among other things, "Speaking of bjs I had quite the perverted dream about you the other night, and then woke up super horny and thought of all the disgusting things I would do to you haha." (*See id.* ¶ 21.)

The next month, in August 2011, when the Victim was 14 and the defendant was 23, the defendant arranged to meet the Victim during a vacation she and her family took to New York City. During that visit, the defendant arranged to meet the Victim surreptitiously at a museum and, later, at the hotel at which the Victim and her family were staying. At the hotel, the defendant took the Victim to a private area and kissed her. (*See id.* ¶ 23.) After that visit, when the defendant and the Victim met in person for the first time, they remained in near-constant contact via email, internet chat, video chat, and social media.

In the following months, the defendant meticulously planned a trip to go abroad to visit the Victim to have sex with her. In 2012, shortly before the defendant traveled to the country where the Victim resided, he wrote about his plans for their sexual activity, suggesting that she purchase condoms. "No," the Victim responded, "**because i look about two**." "Fine [. . .]," the defendant replied, "**but you are ready to lose your virginity next week[?]**" During the defendant's visit to the defendant's country of residence, which lasted approximately nine days, the defendant engaged in oral and vaginal sex with the Victim on several occasions over multiple days. At that time, the defendant was 24 and the Victim was 15. (*See id.* ¶ 25.)

In addition to the defendant's in-person sexual contact with the Victim, online chat logs and emails reflect innumerable explicit references to sexualized video chats, which the defendant sometimes referred to as "perv sessions" or "perv time." Those references include the following very limited sample of communications from the defendant to the Victim:

- "So getting naked tomorrow then?" (April 2012).

- "btw take as much time as you want before feeling comfortable to get naked on cam again" (May 2012).

- "Everyday I think about it, and I just realize I was a terrible bf. I would . . . [g]uilt you into going on cam and showing me pictures and stuff. Guilt you even into perv sessions." (Nov. 2012).

- "All I wanted to do was talk to you on the phone and see you naked on cam." (Nov. 2012).

Additionally, according to the report of the defendant's polygraph examination following his arrest, in a post-polygraph interview with the polygraph examiner, the defendant "advised that . . . he also requested that [the Victim] allow him to see her breasts and vagina as well on several or more occasions via the internet."

Hon. Jed S. Rakoff
June 21, 2016
Page 4

### B. Relevant Additional Conduct

As further discussed below, in addition to the defendant's sexual contact with the Victim and the solicitation of pornography involving the Victim, the defendant's behavior toward the Victim was controlling, psychologically manipulative, and emotionally abusive. During the course of the "relationship" between the defendant and the Victim, the defendant held himself out as a person, and perhaps the *only* person, who could help the Victim with her growing personal issues—which were in part caused and hugely exacerbated by the defendant's own behavior—because he was a medical student. The defendant caused the Victim to deceive her family; pressured her into each meaningful stage of sexual contact, the first experiences of which for the Victim were all with the defendant; and told her to ignore her mental health professionals, writing, in October 2013, when the Victim was attempting to extricate herself from the defendant by not responding to his messages, "[. . .] **just reply and stop believing whatever the bullshit your counselors are feeding you**." (*See id.* ¶¶ 35, 40.)

When the Victim attempted to cut off contact with the defendant several times in 2012 and 2013, the defendant essentially stalked her, contacting her from several different email and social media accounts despite efforts by the Victim to electronically block his communications and despite the Victim's pleas to him not to contact her. Among other actions, the defendant created a WhatsApp social messaging account under an assumed name with the goal of communicating with the Victim extensively under the fake name, gaining her trust under the false identity, and, eventually, after she revealed details of her personal life, encouraging the Victim to reconcile with her previous "boyfriend" (*i.e.*, the defendant himself). (*See id.* ¶ 41.) Notably, the first name the defendant chose for the false account was the first name of the Victim's father.

Many of the defendant's communications to the Victim after she attempted to break off communication with him were cruel and openly remorseless. For example, in September 2012, the defendant made all of the following statements to the Victim in just a single message:

- "[Y]ou need to start showing me some respect, no more telling me to shut up, or telling me to back off or being all around rude asshole. **If you're going to be a cunt to me, don't expect me to just sit there and take it anymore.**"

- "Don't ever ask me whats bothering me again, I'll tell you what I want when I want."

- "You get all pissy if I critizize you and go 'oh I am not good enough for youu, so much pressure, aww poor me.' But then you don't hesitate at all shoving me down and then you have the fucking nerve to turn it around and make me feel bad for making you feel like a bitch."

- "**Seriously you're such a manipulative bitch sometimes.**"

- "STOP being a fucking baby and being controlled by your emotions and so fucking dramatic. What kind of a fucking wimp are you that you can't talk about something that happened in the FUCKING PAST without getting all worked up. Grow a fucking spine you little baby."

- "I still like you, and I am here for you, just stop being an emotional bitch."

Hon. Jed S. Rakoff
June 21, 2016
Page 5

- "**P.S - Fuck you.**"

(*See id.*)  At the time the defendant wrote that email, he was 25 years old and the Victim was 15.

In a July 2013 email, the defendant called the Victim a "Selfish cunt" and, mocking how some victims of sex crimes deal with trauma and ridiculing the Victim through speculation and degradation, wrote, "So how many strangers have you fucked now and send naked pics to on your omegle friends?  Hope you feel in control, if that's what you call it."

On July 26, 2013, the Victim sent the defendant an email, after repeatedly telling him to cease contact with her, stating, among other things, "You are creeping me out and this is getting too stalkerish."  On July 29, 2013, the defendant sent the Victim an email titled, "Not stalking you promise, just say k if you read it. :)"  (*See id.* ¶ 42.)  He sent the email to the Victim from two different email addresses, believing, correctly, that the Victim had tried to prevent his harassment by blocking his primary email address.  (*See id.*)  In the July 29 email, the defendant told the Victim: "**If you are upset that I had sex with you last April then too bad, but I would do it again if I had the chance**. I didn't do anything wrong, in a lot of countries it would be legal, this age thing is a modern construct." (*See id.* ¶ 35.)

In the same email, the defendant also stated, "I was a great fucking bf, I was there for you when you needed me.  I actually helped you through your depression for years. . . . I helped you keep your sanity more than anyone in the world. . . . if I wasn't in your life, you would have committed suicide months ago. . . . So your choice, hoping you put away your pride and put away your anger and let me help you again."  He further blamed the Victim, telling her, "We were 100% equal in our relationship.  You made the decisions on your own."  The defendant ended his email with: "p.s - [. . .] did you block my gmail, I sent you the same on there.  p.p.s - I don't want you having sex with anyone but me."

Following that email, the Victim wrote back, on July 30, 2013, "You are fucking stalking me!"  The Government is not aware of the Victim emailing the defendant after that message, and records from her primary email account at the time reflect no further communication from the Victim to the defendant.  (*See id.* ¶ 42.)  Nevertheless, after that email, the defendant emailed the Victim *more than 40 times* between August 2013 and January 2014.  Those emails included subject lines such as "Reply, for old times sakes," "Will stop emailing," and "acknowledge you read it please" and statements in the emails including "Can you unblock me on kik," "I know you think I am being a creep but I am not," and "Looks like you have made your decision, I get it.  Bye.  p.s. - I want to have a make out session with you right now."  (*See id.*)  A number of these messages were sent multiple times from multiple different email addresses used by the defendant.  (*See id.*)

And in December 2013, at a time when the defendant claims that "[d]uring our final conversations in 2013 I attempted to express to her my thoughts and apologize for my actions, but [the Victim] refused to forgive me" (Def. Ltr. at 5), he wrote the Victim an email stating, among other things: "I don't actually love you as a friend or miss you," "I don't actually care about your family, grandparents or friends," "Don't bother replying, I don't really care how knowing this will make you feel," and, referring to a previous lie the defendant asserted he told the Victim, "I lied to you so you would feel bad."

These messages are examples from the available subset of the communications between the defendant and the Victim. The Government's access to the communications between the defendant and the Victim is somewhat limited because many of them are no longer accessible; retained records primarily include messages to and from an email address previously used by the Victim, certain MSN Messenger chats, and Facebook communications retained in the Victim's account. That does not include approximately thousands of other text, WhatsApp, chat, and phone messages between the defendant and the Victim. But the available emails number in the thousands, and just the Facebook communications alone between the defendant and the Victim total well over 2,000 pages. The defendant's contact with the Victim was extensive.

Finally, regarding possible additional victims, no child pornography was found on the defendant's electronic devices upon his arrest, nor was there any electronic or physical evidence of other relationships between the defendant and other minor children found on the defendant's devices or in the email or social media accounts reviewed pursuant to search warrants. Notably, however, in post-arrest statements made by the defendant, which were recorded and made after a written waiver of rights, he admitted making sexual overtures to other girls in addition to the Victim. Specifically, in talking about the girls he met on Habbo Hotel, the defendant stated, "I never went for, like, the really younger girls, mostly they were like 14." In response to the question from a law enforcement officer, "How many young girls had you asked to see naked," the defendant responded, "Maybe like six or seven" and said the ages were 13 to 17. He further stated: "They usually looked around 15 or 16, the ones who went on webcam who I saw." Later in the post-arrest interview, the defendant also stated, "I had sexual chats with a bunch of girls, anywhere between the ages of like 13 to 17, maybe like 10-ish, saw a bunch of them naked online, on webcams." (*See id.* ¶ 43.)

### C. The Defendant's Plea and Applicable Guidelines Range

The defendant was charged in November 2015 in a five-count Information (the "Information") charging him with two counts of coercing and enticing a minor to engage in illegal sexual activity; two counts of inducement to produce child pornography; and one count of receiving child pornography.

On January 14, 2016, the defendant pled guilty to Count Two of the Information pursuant to a plea agreement with the Government. That count charged the defendant with Coercion and Enticement of a Minor to Engage in Illegal Sexual Activity, in violation of Title 18, United States Code, Section 2422(b).

As agreed by the parties, and as calculated by the Probation Office, the defendant's stipulated Guidelines Range is 292 to 365 months' imprisonment. (*See* PSR ¶¶ 7; *see also* the Plea Agreement.)

The Probation Office recommends the defendant be sentenced to 180 months' imprisonment followed by 10 years of supervised release. (PSR at 27-29.)

Hon. Jed S. Rakoff
June 21, 2016
Page 7

## Discussion

### A. The Defendant's Conduct is Extraordinarily Serious

The Government does not oppose the imposition of a sentence below the Guidelines Range, but strongly believes that a sentence substantially higher than the 10-year mandatory minimum is necessary and appropriate to reflect the seriousness of the offense conduct. The Government acknowledges that, as set forth in the defendant's sentencing submission, the defendant's history and characteristics include significant mitigating factors. However, the breadth of the defendant's conduct, in length of time, flagrance, and effect on the victim, warrant a substantial sentence exceeding the mandatory minimum term of incarceration.

The defendant's crimes here are twofold. *First*, the defendant enticed a minor to engage in illegal sexual conduct by inducing her to have sex with him. Many defendants are sentenced to very lengthy terms of incarceration for simply *attempting* to entice a minor to have sex; here, the defendant actually went through with a contact offense, prepared for—and escalated to—over the course of years. *Second*, the defendant enticed the Victim innumerable times to send pornographic images of herself over the internet, using guilt, harassment, and psychological coercion in his attempts.

The defendant's crimes, as demonstrated both in their character and in the extreme amount of time and manipulation dedicated to their commission, are among the most serious under the law. The Government submits that a lengthy prison sentence is appropriate to reflect the seriousness of the defendant's offense, promote respect for the law and its efforts to eradicate the enticement of minors to participate in illegal sexual activity, and to provide just punishment for the egregious conduct here. *See* 18 U.S.C. § 3553(a)(2)(A).

There is no question or debate about the seriousness of these offenses, and the Government will not here belabor the fact that such conduct shocks the conscience. *See*, *e.g.*, *New York* v. *Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."). This is quite obviously true for the defendant's sexual contact and activity with the minor Victim; it is equally true with respect to his efforts to induce her to transmit sexualized images and videos. *See United States* v. *Reingold*, 731 F.3d 204, 216 (2d Cir. 2013) ("As Congress, courts, and scholars all recognize, child pornography crimes at their core demand the sexual exploitation and abuse of children."). Indeed, it is precisely because "[c]hild pornography harms and debases the most defenseless of our citizens" that "[b]oth the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States* v. *Williams*, 553 U.S. 285, 307 (2008).

### B. The Defendant's Conduct was Profoundly Harmful and Damaging

The defendant wreaked a path of destruction through the Victim's psychological health, emotional stability, and understandings of relationships and trust. The defendant began preying on the Victim when she was just 11 years old, and in the following years, every first significant sexual experience the Victim had was with—and indeed was engineered and coerced by—the

Hon. Jed S. Rakoff
June 21, 2016
Page 8

defendant. As is evident from the impact statements submitted by the Victim's mother, father, and sister, and as the Government expects will be clear from the Victim's in-court statement at the time of sentencing, the defendant's actions have been utterly devastating to the Victim, her family, and her future.

The Government acknowledges unreservedly that some of the communications from the defendant to the Victim were casual, affectionate, and even loving. Out of the many thousands of messages, certainly not all were abusive, and the many manipulative and castigating messages cited herein—while ample in number, starkly disturbing, and representative of additional comments that are cumulative and so not included—are not the exclusive sum of the defendant's communications with the Victim. Nor does the Government suggest that the Victim did not engage with the defendant; she did, in many messages during the years they were in contact. The difference is, of course, that the defendant was an adult, and a highly-educated one, and was nearly a decade older than the child at whom he was directing his controlling and often vitriolic messages. And it was the relentless drumbeat of sexualization, negativity, and harassment that gave the defendant's communications their primary character—and their primary effects.

During the years the defendant spent grooming, and then engaging sexually with, and finally harassing and stalking the Victim, she slowly broke down. As recounted by her mother's impact statement, the Victim as a child was a "happy, fun-loving . . . and sociable" academic high-achiever. "Then," her mother explains, "things started to go wrong."

The Victim slowly became withdrawn. She missed periods of school. She no longer wanted to socialize with family and friends, and became inexplicably fearful. She lost weight. She had suicidal thoughts. She harmed herself—a common response to sexual abuse and a coping mechanism to feel in control, the kind of coping mechanism the defendant once mocked in an email to the Victim, as described above—raking blades across her skin.[3] And for nearly a year after the defendant flew across an ocean to have sex with her, the Victim told no one. These effects are not uncommon for similarly-victimized individuals; to the extent they may seem extreme, it is important to note that the defendant's victimization and revictimization of the Victim took place over the course of years and during the formative period of the Victim's adolescence.

Even after committing the criminal conduct to which the defendant has pled guilty, he terrorized the Victim by stalking and harassing her. He repeatedly sent abusive messages to the Victim, his continued unwanted contact requiring her to switch email and social media accounts and to attempt to electronically block his messages. And he instilled a gripping fear in the Victim that she can never be safe from him. The defendant also held himself out as a quasi-professional, medically, with respect to the Victim's deepening mental health issues—which he himself was in fact largely responsible for causing and worsening—and later attempted to

---

[3] *See* Learn More: Cutting, *The Jed Foundation*, ("Although not always true, cutting is frequently linked to childhood abuse (especially sexual abuse)"), *available at* https://www.jedfoundation.org/learn-more/cutting; Self-Harm, *Rape, Abuse & Incest National Network* ("Some survivors of sexual assault may use self-harm to cope with difficult or painful feelings."), *available at* https://rainn.org/get-information/effects-of-sexual-assault/self-harm.

convince the Victim that were it not for his presence in her life, she would have killed herself. As described above, the defendant even invented a fake identity on a social media platform to contact and manipulate the Victim. For these reasons, as well as to protect other minors from the defendant in the future, a lengthy term of supervised release, with the special condition that the defendant never be allowed to contact the Victim or her friends or family, is warranted. Indeed, a review of the defendant's electronic devices following his arrest showed that the defendant had searched online for the Victim's name as recently as *the day before he was arrested.* There is no question that the defendant lacks the self-control and understanding of the effects of his actions to be left unsupervised, particularly with respect to any future contact with the Victim.

### C. The Defendant's Arguments for the Minimum Sentence are Unpersuasive

The defendant asks for a sentence of 120 months, the mandatory minimum term of imprisonment associated with his crimes—that is, the lowest possible sentence that would be allowed by law for *any* defendant who pled guilty to or was convicted of a violation of Title 18, United States Code, Section 2422(b). (*See* Def. Mem. at 7.) The defendant claims such a sentence is justified in light of the life he led separate from this conduct, including, as amply demonstrated by the many letters from friends and family, his kindnesses to family and friends and his academic success. (*See generally* Def. Mem. Exhibits.) This request should be denied.

As described at length above, the defendant's criminal actions were extraordinarily serious, and the effects of that conduct have been devastating. The defendant's sentencing submission argues that he acknowledges and takes responsibility for his conduct (*see* Def. Mem. at 6-7), and that he does not pose a future danger (*id.* at 7). The Defendant Letter asserts the same. (*See* Def. Ltr. at 1, 9.) But both of these arguments are greatly undermined by the fact that the defendant has demonstrated an alarming refusal to acknowledge his misconduct—and indeed, an inclination to blame the Victim for his crimes and to minimize and excuse his actions, both at the time of his conduct and following his arrest.

During the time of the defendant's conduct, in an email to the Victim in July 2013, he stated, "If you are upset that I had sex with you last April then too bad, but I would do it again if I had the chance. I didn't do anything wrong, in a lot of countries it would be legal, this age thing is a modern construct." He told the Victim in another email that "We were 100% equal in our relationship. You made the decisions on your own." Years later, having had ample time to consider his actions, in an interview with the FBI following his arrest, in response to a remark from an FBI agent that the defendant seemed to be blaming the Victim for their sexual encounter, the defendant replied, "She'd guilt me into it."

Moreover, even after the defendant pled guilty in this case, he continued to minimize and dissemble regarding his interactions with the Victim—including in his purportedly regretful letter to the Court. In his interviews with Dr. Shoshanna Must for the Adult Sexual Offense Risk Evaluation Psychosexual Report (the "Report"), dated April 18, 2016, for example, the defendant "minimized how many times he emailed [the Victim in the end of 2013], suggesting it was one or two times." (Report at 20.) In fact, as described above, the defendant emailed the Victim more than 40 times between August 2013 and January 2014, including from multiple different email addresses to circumvent the Victim's attempts to electronically block his communications.

Hon. Jed S. Rakoff
June 21, 2016
Page 10

He also claimed to Dr. Must that "the content of the emails were always supportive to her in nature" before being confronted with evidence that profoundly contradicts such an assertion. (*Id*. at 5.)  The defendant further mischaracterized how early he began to sexualize the discussions with the Victim, admitting the correct timing only after being confronted with records that belied his claims.  (*Id.* at 18.)

Similarly, the defendant's statement to Dr. Must that "in 2012 he quickly realized how inappropriate the relationship was" but "was reluctant to break it off with her" (*id.* at 19) beggars belief.  He makes a similar claim in the Defendant Letter, asserting, "I felt such profound sympathy for [the Victim] that it clouded my judgment in breaking off contact" and "[. . .] I almost felt it was my responsibility to rescue her from her predicament." (Def. Ltr. at 3.)  What the defendant either cannot or will not acknowledge is that *his behavior was her predicament.* Moreover, the defendant's excuses are after-the-fact rationalizations.  As described in detail above, far from being "reluctant" to conclude his interactions with the Victim, when she herself attempted to end the abusive relationship he harassed and stalked her for months.

Part of that obsessive behavior was the defendant's use of a fake identity to contact the Victim, certainly not "only so he could make sure that she was taking care of her mental health symptoms," as he claimed to Dr. Must. (Report at 19.)  Rather, as the defendant admitted in his own words in a December 2012 email, confessing his trick to the Victim, he pretended to be another person in communications with the Victim so he could convince her to reconcile with her ex-boyfriend—*i.e.*, the defendant himself: "Read online how some guy pretended to be someone else and got close to his wife and she wasn't even mad when he told her. . . . I liked being [the false identity] because I could be myself, I didn't have to pretend to be 'a nice guy' as myself to 'win you back.' . . . It kind of got out of control because I started defending myself from you as dave and then I couldn't tell you. **Initial plan was to be like 'hey told you when I am myself you like me**.'"

The Defendant Letter continues the defendant's pattern of minimizing his behavior and implicitly casting responsibility on the Victim.  "At no point," the defendant writes, "did I intentionally seek to harm or take advantage of [the Victim]."  (Def. Ltr. at 1.)  But the defendant's conduct was, at best, indistinguishable from actions intended to cause harm.  The defendant also suggests the Victim was responsible for the early stages of the "relationship," claiming: "During the first two years, I rarely initiated a conversation with her, since her existence did not register in my conscious mind."  (*See id*. at 2.)

The defendant also inexplicably informs the Court that he "inquired if she was comfortable speaking to someone who was twenty-one" and that "she replied that she regularly conversed with people around that age whom she had met on-line." (*See id.* at 2.)  If this has any relevance at all, it is to show that *adult contact with minors*—which the defendant seems to blame generally, insofar as he repeatedly states that he should have broken off all contact from the beginning—was not the problem here.  Indeed, any other adults the Victim met online as a pre-teen managed to converse with her without asking her to show her body, or inquire about her views on performing oral sex, or to have sex with her while she was a minor.  The defendant's crime is the enticement of a minor to engage in illegal sexual activity, not online discussions.

Hon. Jed S. Rakoff
June 21, 2016
Page 11

And yet the defendant repeatedly asserts that his mistake was failing to cut off all contact with the Victim. (*See* Def. Ltr. at 1 ("I should have broken off all communication with her when she informed me she was thirteen"), 2 ("I came to the realization that it was my responsibility to cease all contact"), 3 ("I felt such profound sympathy for [the Victim] that it clouded my judgment in breaking off contact").) This is a mischaracterization and a minimization of the defendant's behavior: he did not need to avoid *all* contact with the Victim, but rather *sexual* contact. The existence of online communication did not somehow compel the defendant to sexually exploit the Victim. Similarly, the defendant wrongly presents their interactions as one-sided, writing that "[a]lthough I was uneasy to share details about my personal life, [the Victim] had no such qualms" and that the Victim "told me in excruciating detail" about her personal life. (*See id.* at 3.) This minimization is minor but telling; in truth, the defendant sent thousands of messages to the Victim and communicated with her at extraordinary length about his family, his studies, his interests, and his personal problems.[4]

Most importantly, the defendant also minimizes and elides his conduct with respect to the sexual contact. He claimed to Dr. Must that having sex was "at [the Victim's] initiation, and that he did not want to have sex." (Report at 18.) And in the Defendant Letter, he writes that he "had no intention to commit anything illegal or immoral" but was "caught in the moment." (Def. Ltr. at 4.) Contemporaneous evidence shows that these characterizations are flagrantly untrue. As described in part above, for weeks in advance of his trip the defendant made references to the planned sexual encounter.

In at least as early as November 2011, nearly five months before the defendant had sex with the Victim, he sent the Victim messages on Facebook stating "i'll have enough [money to afford the trip] by april" . . . "so sexy time all three days." In February 2012, he wrote messages to the Victim stating, among other things: "Do you fantasize about April and get turned on sometimes?", "P.s. – I am totally not being too gentle in April haha," and "I can totally wait until April, might not last more than 5 minutes but that would just mean round 2 which would be hours long haha." And just before he traveled to meet the Victim, he suggested that she should purchase condoms for when he would arrive. "No," the Victim responded, "because i look about two." "Fine [. . .]," the defendant replied, "but you are ready to lose your virginity next week[?]"

---

[4] The defendant also misleadingly asserts that "[the Victim's] parents were aware of my existence." This is true, but not in the way the defendant implies: when the defendant surreptitiously met the Victim at a museum, her parents were there, saw him talking to her, and asked who he was. The Victim did not tell her parents about their relationship. Indeed, the brazenness of the defendant's action has caused additional pain to the family. As the Victim's sister described in her statement to the Court, addressing the defendant: "I remember the day you met her in New York. The day you had the audacity to stand in front of my parents in the New York Metropolitan Museum of Art. It makes me sick. It makes me want to claw at my own skin that I was wandering the museum [. . .] whilst you were one step closer to sexually assaulting my little sister. It makes me sick that my parents have to live with the guilt of seeing you next to her and not knowing, not saving her."

Hon. Jed S. Rakoff
June 21, 2016
Page 12

The defendant's assertions that the Victim initiated sex that he did not want to have are lies, delusions, or both.[5]

Regarding his admission to FBI agents that he made sexual overtures to several other girls in addition to the Victim, as discussed above, the defendant claimed to Dr. Must that "he did not have any sexual conversations with anyone else on the Internet" and he made inculpatory statements regarding a number of other girls because "he was scared to admit he had sex with [the Victim], so in efforts to downplay his sexual relationship with [her], he reported that he had online sexual conversations with other minors as well." (Report at 13.) The defendant's claim, therefore, is that to distract FBI agents from and to "downplay" his crimes in this case he *invented having committed additional criminal conduct*. This strains credulity.

The defendant writes to the Court that he "take[s] full responsibility" for his conduct and that "the responsibility is entirely mine for damaging my career and my life." (Def. Ltr. at 8, 9.) This is appropriate, and the defendant is correct that he is responsible for his actions. But taking responsibility (and even then, focused on his own "career and […] life" and while also claiming that he "had no intention to commit anything illegal or immoral" (*id.* at 4)) is different from expressing remorse or being honest about his conduct. In his letter the defendant does, finally, acknowledge being "selfish and unjust"—but not to the Victim; rather, toward his family. (*See id.* at 6.)

The defendant's unwillingness or inability to express understanding of—and remorse for—his actions is deeply troubling, and suggests that a very significant sentence is particularly important for specific deterrence and protection of the public. *See United States* v. *Broxmeyer*, 699 F.3d 265, 295 (2d Cir. 2012) (Raggi, J.) (In rejecting a challenge to a 30-year prison sentence for possession and attempted production of child pornography by a defendant, who had "blamed his victims rather than himself for the range of sexual misconduct at issue" and "minimized his own enticement of teenagers to produce child pornography for him," noting that the district court had "found that Broxmeyer showed a disturbing lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct, a circumstance that further expanded the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public."); *see also United States* v. *Burgos*, --- Fed.Appx. ----, 2015 WL 9487869, at *2 (2d Cir. 2015) (defendant's "culpability was aggravated further by his demonstrated lack of remorse, specifically noted at sentencing by the district court"); *Miller v. Walker*, 413 F.Supp.2d 251, 261 (W.D.N.Y.) (Bianchini, Mag. J.) ("It is well-recognized that a defendant's manifestation of remorse and his acceptance of responsibility for his conduct are proper factors to consider in sentencing." (*citing United States* v. *Jacobson,* 15

---

[5] The defendant's explanation to Dr. Must for why the Victim purportedly wanted to have sex is also an easily-disproven falsehood. The defendant "attributed his perception that she was interested in sex as due to the fact that many of her friends were having sex." (*See* Report at 18.) Not only was this not the case, *the defendant himself made reference at the time* to that not being true. In the same April 2012 online chat when the defendant asked the Victim if "you are ready to lose your virginity next week," his very next message to the Victim, before any response, was "before your sis and all your friends?"

Hon. Jed S. Rakoff
June 21, 2016
Page 13

F.3d 19, 23 (2d Cir. 1994); *United States* v. *Blair,* 958 F.2d 26, 30 (2d Cir. 1992); *United States* v. *Cousineau,* 929 F.2d 64, 69 (2d Cir. 1991)).

Finally, while the Government does not oppose a below-Guidelines sentence, the Guidelines nevertheless provide relevant guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). The Guidelines are the "starting point and the initial benchmark" in sentencing proceedings, *Gall* v. *United States*, 552 U.S. 38, 49 (2007), before the Court considers the factors outlined in Title 18, United States Code, Section 3553(a). The Government notes that the Second Circuit has acknowledged that the relevant Guideline here "is fundamentally different from most," because the offense level and enhancements have been increased at the instruction of Congress, and therefore must be "applied with great care" to avoid "unreasonable sentences." *United States* v. *Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). Such care is necessary because the enhancements apply with such frequency that they "routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." *Id.* at 186.

This, however, is not a "run-of-the-mill" case. The defendant did not just possess child pornography—he solicited and created it, by enticing the Victim to engage in live sexualized depictions. Moreover, the solicitation and production of such child pornography fueled a pattern of behavior that eventually resulted in the defendant flying to another continent to have sex with the Victim. The defendant is not merely the kind of defendant who possessed or even "just" enticed the creation of child pornography—he went beyond satisfying his damaging visual sexual desires and proceeded to have contact with the Victim, following a years-long process of grooming and manipulation.

## Conclusion

Accordingly, the Government respectfully requests that the Court impose upon the defendant a sentence substantially above the 120-month mandatory minimum sentence, as well as a lengthy term of supervised release, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Alex Rossmiller
Assistant United States Attorney
Tel.: (212) 637-2415

Cc: Jeffery L. Greco, Esq., counsel for defendant (via ECF)